## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES AINSWORTH, JR.,** | : | CIVIL NO. **1:13-CV-1351** |
| | : | |
| Plaintiff, | : | (CALDWELL, J.) |
| | : | |
| v. | : | (SCHWAB, M.J.) |
| | : | |
| **CAROLYN W. COLVIN**, | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

## I.      INTRODUCTION AND PROCEDURAL HISTORY.

The Plaintiff, James Ainsworth, Jr. ("Ainsworth"), appeals the  February 23,

2012, adverse decision denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act ("Act")  and supplemental

security income benefits ("SSI") under Title XVI of the Act.  42 U.S.C. §§ 401-

433, 1381-1382f; *Doc*. 1.   Ainsworth contends that the final decision of the

Commissioner, denying his applications for benefits, is unsupported by substantial

evidence.  He raises three issues in support of his contentions.  First, he argues that

the Administrative Law Judge's ("ALJ") decision is rendered defective by a flawed

evaluation of the medical evidence of record.  Second, he argues that the ALJ erred

in relying on the testimony of an impartial vocational expert ("VE") as substantial evidence in support of his decision. Third, Ainsworth asserts that the ALJ's decision is rendered defective by a flawed evaluation of the credibility of Ainsworth's subjective testimony, which he alleges is fully supported by evidence from his fiancée.

On July 18, 2013, the Commissioner filed an Answer to Ainsworth's Complaint and a copy of the administrative record. Thereafter, both parties filed separate briefs in support of their respective positions. Jurisdiction over this case is conferred upon this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). On October 10, 2013, this matter was referred to the undersigned Magistrate Judge for pretrial management and the preparation of a report and recommended disposition. This appeal has been fully briefed and is now ripe for resolution.[1]

Upon consideration of the entire record submitted by the parties, and for the reasons set forth below, I recommend that the Commissioner's final decision be affirmed.

---

[1] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is a "adjudicated as an appeal." L.R. 83.40.1.

## II.      SUMMARY OF THE ADMINISTRATIVE PROCEEDINGS.

Ainsworth was born on December 11, 1968, *Doc*. 13, p. 2, and was 41 years old on his alleged onset date of disability. *Tr*. 15, 34.[2] Under the Social Security Regulations ("Regulations") he is considered a "younger person;" therefore, his age presents little or no barrier to his adjustment to alternative employment. 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and is able to communicate in English. *Tr*. 34. Ainsworth applied for DIB and SSI on April 26, 2010, alleging that he had been disabled since May 1, 2009, in large part due to pain in his right knee. The Administration denied Ainsworth's claim initially on October 7, 2010. Ainsworth timely filed a request for a hearing on November 14, 2010, which was granted. Thereafter, Ainsworth, on November 17, 2011, represented by counsel, appeared and testified during an administrative proceeding before ALJ Peter V. Train in Harrisburg, Pennsylvania. VE Paul A. Anderson also appeared and testified during the administrative proceeding. Thereafter, the ALJ denied Ainsworth's applications for benefits in a written decision on February 23, 2012.

---

[2] "*Tr*." Refers to the transcript from the Social Security Administration ("Administration") and appears as Document 10 and its attachments on the ECF docket report. The pinpoint citations to the transcript refer to the Bates-stamped number in the lower right-hand corner of each page.

Following the ALJ's denial of his claims, Ainsworth sought review of the ALJ's decision by the Appeals Council of the Office of Adjudication and Review ("Appeals Council").  On April 29, 2013, the Appeals Council denied Ainsworth's request.  Therefore, the ALJ's decision, dated February 23, 2012, denying Ainsworth's claims, is the "final decision" of the Commissioner subject to judicial review by this Court under the Act.  20 C.F.R. §§ 404.981, 416.1481.

To receive benefits under Title II or XVI of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  Furthermore:

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1383c(a)(3)(B).  In addition to the above-listed requirements, to receive benefits under Title II of the Act, a claimant must show

4

that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). Title XVI, however, is a needs-based program; thus, eligibility under Title XVI is not contingent upon a claimant's insured status.

It is the responsibility of the ALJ to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.  In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  As part of this analysis the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  *See* 20 C.F.R. §§ 404.1520, 416.920.  If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed any further.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Moreover, between steps three and four of this process, the ALJ must determine the claimant's residual functional capacity ("RFC") as defined by 20 C.F.R. §§ 404.1545, 416.945.  20 C.F.R. §§ 404.1520(e), 416.920(e).

The claimant bears the initial burden of demonstrating that he or she has a medically determinable impairment that prevents him or her from engaging in past relevant work.  42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H)(i); 20 C.F.R. §§ 404.1512, 416.912.   Once the claimant has satisfied his or her burden at steps one through four, it is incumbent upon the ALJ to show that jobs exist in the national economy that the claimant could perform and that are consistent with his or her age, education, work experience, and RFC.  20 C.F.R. §§ 404.1512(f), 416.912(f).

In this case, the ALJ found that Ainsworth met the insured status requirement under Title II of the Act through June 30, 2012.  He then proceeded through steps one through five of the sequential evaluation process.  Ultimately, the ALJ concluded that Ainsworth was not disabled at any time between May 1, 2009, his alleged onset date, and February 23, 2012, the date of his decision.

At step one of his evaluation, the ALJ found that Ainsworth had not engaged in any substantial gainful activity between May 1, 2009, and February 23, 2012. *Tr.* 15.  At step two of his evaluation, the ALJ found that Ainsworth had medically determinable severe impairments consisting of patellofemoral degenerative joint disease of the right knee; status post right patella fracture; and disc protrusion at L4-5.  *Id.*  With respect to Ainsworth's decreased intellectual functioning and bipolar disorder, the ALJ found that such were unsupported by medical evidence of record, which failed to show significant complaints of, or treatment for, decreased

intellectual functioning and bipolar disorder after May 1, 2009. *Id.* The ALJ concluded that these conditions did not cause any more than a minimal limitation on Ainsworth's ability to perform basic work tasks; therefore, he found that the decreased intellectual functioning and bipolar disorder were not severe. *Id.* Proceeding to step three of his analysis, the ALJ found that Ainsworth did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Tr.* 16.

Prior to step four, the ALJ found that Ainsworth had the requisite RFC to perform light work, subject to the following additional limitations:

> [S]itting 1 hour at a time for a total of 3 hours in an 8 hour workday; standing 1 hour at a time for a total of 2 hours in an 8 hour workday; walking 40 minutes at a time for a total of 3 hours in an 8 hour workday; must be able to use a cane to ambulate occasionally but is able to ambulate ¾ of a mile without the use of a cane; occasional operation of foot controls bilaterally; not climbing stairs, ramps ladders, or scaffolds; no balancing, stooping, kneeling, crouching or crawling; occasional working in extreme cold or extreme heat; occasional working around dust, odors, fumes and pulmonary irritants; occasional working around vibrations; no working around wetness and humidity; no operating a motor vehicle; and no working around unprotected heights or moving mechanical parts.

*Tr.* 17; *see also* 20 C.F.R. §§ 404.1567(b), 416.1567(b)(defining "light work").

At step four of his analysis, the ALJ found that Ainsworth's current RFC precluded him from performing the physical and mental demands of his past

relevant employment as a landscaper, laborer, and mechanic technician. *Tr.* 22, 190.

Finally, at step five of his analysis, the ALJ found that given Ainsworth's RFC, age, education, and work experience, there were jobs of significant number in the national economy that Ainsworth could perform. *Tr.* 22. The ALJ based his conclusion on the testimony of a VE that a younger individual with at least a high school education, who could communicate in English with the RFC discussed above could perform the representative occupations of: information clerk (DOT 237.367-018), with 1,082 jobs in the local economy, 6,800 jobs in the regional economy, and 166,000 jobs in the national economy; and, cashier (parking lot, entertainment) (DOT 211.462-010) with 522 jobs in the local economy, 3,200 jobs in the regional economy, and 68,000 jobs in the national economy. *Tr.* 67-68.

## III.   FACTUAL BACKGROUND.

### A. Physical Medical History.

The record establishes that from April 2010 to May 2011, Ainsworth was treated by Raymond E. Dahl, D.O. ("Dr. Dahl") and Michael R. Werner, M.D. ("Dr. Werner") from Orthopedic Institute of Pennsylvania ("OIP") for patellofemoral degenerative joint disease of the right knee. *Tr.* 256. Within that time frame, Ainsworth also saw Drs. Dahl and Werner for a right patella fracture.

*Tr.* 343.  The records establish that Dr. Dahl consistently opined that Ainsworth's symptoms would not improve with surgery.  *Tr.* 256, 344.  Dr. Dahl completed a check-box Employability Assessment Form, dated April 20, 2010, in which he assessed that Ainsworth was temporarily disabled less than 12 months beginning on April 20, 2010.  *Tr.* 172-74.  Dr. Dahl ordered an MRI of the right knee, which he reviewed with Ainsworth on May 5, 2010.  *Tr.* 256.  Dr. Dahl noted that Ainsworth's posture and gait were normal, but that his knee was tender, his right leg was neurovascularly intact with good sensation and good distal pulses, and there was no ligamentous laxity.  *Id.*  Ainsworth's MRI showed a medial plica and arthritic changes, involving the patellofemoral joint, but that there was no evidence of a meniscus tear.  *Id.*  Dr. Dahl diagnosed patellofemoral degenerative joint disease of the right knee, but did not feel that Ainsworth's symptoms would improve with knee arthroscopy and instead discussed Synvisc injections.  *Id.*

In September 2010, Ainsworth saw his family physician Glen R. Daughtry, D.O. ("Dr. Daughtry") who observed that Ainsworth's chronic right knee pain was worsening and that he had decreased range of motion. *Tr.* 319.  Dr. Daughtry further noted that Ainsworth had a chronic history of depression, which was ongoing and worsening, but that it was secondary to his chronic pain and inability to work.  *Id.*  Dr. Daughtry referred Ainsworth to OIP for evaluation and treatment. *Id.*  On November 9, 2010, Dr. Dahl examined Ainsworth and noted that he

exhibited normal posture and gait. *Tr.* 344. He also noted that Ainsworth had crepitus with range of motion; however, his right lower extremity was neurovascularly intact with good sensation and good distal pulses. *Id.* Dr. Dahl's impression was that there were no surgical options; he recommended pain management and placed Ainsworth in a lateral J brace. *Id.*

From about December 1, 2010 to September 22, 2011, Ainsworth treated with PRISM for pain management, at various times seeing Michael F. Lupinacci, M.D. ("Dr. Lupinacci"),William A. Pomilla, M.D. ("Dr. Pomilla"), and Rebecca Lingenfelter, PA-C ("Ms. Lingenfelter"). *Tr.* 370-382. Throughout this time period he was prescribed various narcotic pain medications such as, MS Contin, Gabapentin, a Lidoderm patch, Tramadol, and Neurontin. *Id.* On or about August of 2011, he also began receiving epidural steroid injections for an L4-5 disc protrusion in his back. *Tr.* 372.

Ainsworth returned to OPI on January 31, 2011, this time seeing Michael R. Werner, M.D. ("Dr. Werner"), and reported that he had fallen on his right knee sometime in the fall.[3] *Tr.* 343. Dr. Werner diagnosed a right patella fracture and ordered crutches and a Bledsoe brace, which was partial weight bearing. *Id.* Dr. Werner advised Ainsworth to continue with pain management and to follow up with OPI in six weeks. *Id.* Ainsworth followed up with Dr. Werner a week later,

---

[3] Dr. Lupinacci, who saw Ainsworth twice in December of 2010 and on January 10, 2011, does not mention that Ainsworth reported a fall to him.

on March 14, 2011. *Tr.* 329. On examination, he had tenderness, bruising, and limited active range of motion of the right extensor mechanism. *Tr.* 329. He was stable ligamentously, but still tender over the patella. *Id.* Diagnostic tests showed mild degenerative changes in the medial compartment, IM rod femur. *Id.* Dr. Werner ordered Ainsworth a better fitting brace and a follow-up visit after an MRI to rule out extensor mechanism disruption. *Id.*

Ainsworth followed up with Dr. Werner on April 4, 2011, and again on May 16, 2011. *Tr.* 328, 340. At the April visit Dr. Werner noted that Ainsworth had some tenderness around his knee and limited range of motion that predated his most recent injury. *Tr.* 328. Dr. Werner observed no difficulty with his extensor mechanism on MRI and planned to keep him in a brace, follow-up in 6 to 8 weeks predicting his bone would then be healed. *Id.* At the May follow-up visit, Dr. Werner noted that Ainsworth had much less tenderness and weakness, good active range of motion, and an intact right extensor mechanism. *Tr.* 340. His patella and leg lengths were stable, and he ambulated in his brace without an assistive device. *Id.* Diagnostic tests showed no fractures or dislocations and mild arthritic changes of the knee. *Id.* According to Dr. Werner, surgery was not indicated for this fracture, which he considered healed, and Ainsworth had healed enough to be weaned off of the patella brace to his standard OA brace. *Id.* Dr. Werner noted that he would see Ainsworth back as needed. *Id.*

11

At his May 25, 2011, follow-up appointment with Dr. Dahl, Ainsworth reported that overall his pain management with PRISM was going well. *Tr.* 339. Upon examination, Dr. Dahl noted that Ainsworth was in no acute distress, very cooperative, and had normal posture and antalgic gait. *Id.* Despite some tenderness along the medial joint line, Ainsworth's right lower extremity was neurovascularly intact with good sensation and good distal pulses and no ligamentous laxity. *Id.* Again Dr. Dahl advised against a knee replacement and encouraged him to start biking. *Id.*

In addition to OIP and PRISM, Ainsworth was followed throughout the relevant time period by his family doctor, Dr. Daughtry, who completed two check-box medical source statements dated July 27, 2010 (*Tr.* 261) and October 21, 2011 (*Tr.* 362) and ordered a functional capacity evaluation[4] (*Tr.* 267), which occurred in the form of an Occupational Therapy Evaluation Report ("OT Eval. Report") dated May 10, 2010. *Tr.* 268. In his medical source statement dated July 27, 2010, Dr. Daughtry assessed that Ainsworth occasionally had limitations with bending, kneeling, stooping, crouching, and climbing, and frequently had limitations with balancing. *Tr.* 265. He further assessed that Ainsworth had no limitations handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling,

---

[4] The functional capacity evaluation was completed by Pinnacle Health Comprehensive Occupational Rehabilitation Center, Robert L. Markley, MA, OTR/L. *Tr.* 281.

or in being continent, but that he did have limitation with reaching. *Id.* Dr. Daughtry found that Ainsworth was capable of occasionally lifting and carrying 50 pounds, standing and walking up to 6 hours per day in an 8 hour workday, sitting up to 6 hours in an 8 hour workday, and pushing and pulling 59 pounds bilaterally in the upper and lower extremities. *Tr.* 266.

In his medical source statement dated October 21, 2011, Dr. Daughtry opined that Ainsworth was not limited in reaching, handling, fingering, feeling, pushing or pulling. *Tr.* 364. He further opined that Ainsworth could: lift up to 10 pounds continuously and up to 20 pounds occasionally; carry up to 20 pounds occasionally; sit for one hour at a time for a total of 3 hours in an 8 hour workday; stand for one hour at a time for a total of 2 hours in an 8 hour workday; and walk 40 minutes at a time for a total of 3 hours in an 8 hour workday. *Tr.* 362-63. Dr. Daughtry assessed that Ainsworth's use of a cane was medically necessary, but that he is able to ambulate up to ¾ mile without it. *Tr.* 363. The doctor further found that Ainsworth could occasionally operate foot controls bilaterally, but that he could not operate a motor vehicle. *Tr.* 364, 366. Further, Dr. Daughtry opined that Ainsworth could not bend, kneel, stoop, crouch, crawl, and could not climb ladders, scaffolds, stairs or ramps. *Tr.* 365. He also opined that Ainsworth could not work around unprotected heights, wetness, humidity, or mechanical parts, and

could only occasionally work around extreme cold, extreme heat, vibrations, dust, odors, fumes, and pulmonary irritants. *Tr.* 366.

## B. Mental Health History.

At the hearing, Ainsworth testified that he attended special classes in school (*Tr.* 34), and that he took Seroquel twice daily for bipolar. *Tr.* 41. On September 29, 2010, Ainsworth saw Stanley Schneider, E.D.D. ("Dr. Schneider), on a referral from the Commonwealth Bureau of Disability Determination, for a clinical psychological disability evaluation. *Tr.* 285. Dr. Schneider noted that Ainsworth had never been hospitalized psychiatrically and had never been treated as an outpatient for mental health issues. *Tr.* 287. He further noted that Ainsworth had self-reported a diagnosis of bipolar disorder, for which he was treating successfully with medication prescribed by Dr. Daughtry. *Id.* Dr. Schneider also opined that Ainsworth was moderately impacted by his right knee impairment and in his ability to carry out simple and detailed instructions and that he was only slightly impacted in his ability to make judgments on simple decisions. *Tr.* 293. Regarding Ainsworth's ability to respond to supervision, co-workers and work pressures, Dr. Schneider opined that Ainsworth was only slightly impacted in his ability to interact appropriately with the public and with co-workers. *Id.* Dr. Schneider further opined that Ainsworth was moderately impacted in his ability to

interact with supervisors and respond to work pressures and changes in a routine work setting.  *Id.*

On October 7, 2010, a Psychiatric Review Technique ("PRT") form was prepared by consultative examiner, Dr. Michael Suminski, Ph.D. ("Dr. Suminski") Tr. 300.   On this check-box form, Dr. Suminski found that Ainsworth was moderately limited in his ability to understand and remember detailed instructions, and in his ability to maintain attention and concentration for extended periods.  *Id.* Ainsworth was deemed not significantly limited in all other categories.  *Id.*   In the Mental Residual Functional Capacity Assessment, also dated October 7, 2010, Ainsworth was found to be able to meet the basic mental demands of competitive work on a sustained basis despite his right knee limitations.  *Tr.* 302.

On October 19, 2011, Ainsworth met with Licensed Psychologist William D. Thomas, M.S. ("Mr. Thomas"), on a referral from his attorney, for a psychological evaluation.  *Tr.* 357.  Mr. Thomas opined that Ainsworth had a full scale IQ test of 87, placing him in the average/dull normal range of intellectual functioning.  *Tr.* 358.   He further opined that because of his low average intellectual functioning, Ainsworth was experiencing academic and social/emotional regression due to learning disabilities and psychological or social/emotional disabilities.  *Tr.* 360.   Per Mr. Thomas, it is doubtful that

Ainsworth is capable of any gainful and competitive vocational activity and of being trained or educated given his learning disabilities.  *Id.*

### C.  Ainsworth's Hearing Testimony.

At the hearing, Ainsworth testified that he last worked for RPI Services doing lawn work and snow shoveling and that he was terminated from that employment because he could no longer do the job.  *Tr.* 37.   After such termination, he testified that he no longer looked for work because his leg started to hurt more.  *Id.*  He reported that he was treating with his family doctor, Dr. Daughtry, for pain management and that he occasionally saw doctors at OIP for his knees.  *Id.*  Ainsworth recounted that his typical day is spent on the couch with his right leg propped up, watching TV or sleeping, because his medications made him sleep.  *Tr.* 41.  He listed his medications as Hydrocodone, Gabapentin, Morphine, Seroquel, and Citalopram, which he stated was generic for Celexa and taken by him for bipolar.  *Id.*  He stated that his medications kept the pain "kind of normal and that the Seroquel and Citalopram were working.  *Tr.* 43, 51, 52.  Ainsworth reported that he is able to dress himself, sometimes make lunch for himself, and climb upstairs to take a shower.  *Tr.* 42.  Ainsworth also reported that about once a week, if he is feeling all right, he rides his bike around the block a couple of times, but then has to take more pain medication. *Tr.* 55.  On the days when he can do

more activity, he stated that, on a scale from 1 to 10, with 10 being the worst pain, his pain level was between 4 and 5 and that on any given week he spends 4 out of 7 days on the couch, only getting up once during those days to go to the bathroom and let the dog out. *Tr.* 55-56.

Ainsworth testified that he believes his pain has gotten worse since he fractured his knee cap and that, although his doctors were discussing knee replacement surgery, they would not perform the procedure until he is 55 years old. *Tr.* 57.  He stated that more recently he also has had problems with both knees and his back when sitting and that since he had been sitting at the hearing for about an hour and 40 minutes, he was experiencing throbbing in his right knee and back pain that was uncomfortable. *Tr.* 57-60.  He stated he was receiving epidural injections for his back pain. *Tr.* 58-59.

Although he mostly sleeps on the first floor on the couch, he stated he climbs up the stairs to sleep in bed three or four times per month. *Id.* He stated that he vacuums the living room once in a while, makes dinner, and goes to the grocery store, but leans on the cart while he pushes it. *Tr.* 46. He explained that he uses a cane and a knee brace "every now and then" if he is out for a "period of time" and knows he will be walking, and that how far he walks depends upon the day and how much pain he is feeling. *Tr.* 47.

Ainsworth acknowledged that Dr. Daughtry sent him, in May of 2010, for a functional capacity evaluation (*Tr.* 268-283) to assess his limitations and to help him find work. *Tr.* 49. Upon questioning from the ALJ regarding the report's suggestion that he go to the office of vocational rehabilitation for training, Ainsworth testified that he never saw the report and forgot all about it until the ALJ mentioned it. *Tr.* 50. According to Ainsworth, he has gained weight since he stopped working and was planning on speaking with his doctors about a diet and about aqua therapy. *Tr.* 60.

### D.   Testimony of Ainsworth's Fiancée.

Ainsworth's fiancée, Maria Bucher ("Bucher") testified that his knee problems first began after an auto accident in 2005. *Tr.* 62-63. She stated that Ainsworth can no longer do things around the house and that his typical day is spent being sedentary on the first floor couch. *Id.* She further testified that she periodically has to remind him to take his medications and that his ability to attend family functions has declined. *Tr.* 64. Bucher stated that her main concern about Ainsworth's ability to function in the workplace relates to the medications he is taking and how they make him doze off and incoherent. *Tr.* 65. She also notes concern with him working because of his inability to stand and sit for a long period of time and the fact that he has to elevate his leg. *Id*

## IV.    DISCUSSION.

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the ALJ and this Court. Once the ALJ has made a disability determination, it is the responsibility of this Court to independently review that finding. This task requires the application of a specific, well-settled, and carefully articulated standard of review.   Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review.   *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, this Court's review is confined to the issue of whether the ALJ's decision is supported by substantial evidence.   *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *see also Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).   Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson*, 529 F.3d at 200 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988).   It is less than a preponderance of the evidence but more than a mere scintilla of proof.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Plummer*, 186 F.3d at 427 (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064-66 (3d Cir.1993). However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).   Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

### A. The ALJ's Evaluation of the Medical Evidence is Well-Reasoned, and Clearly Explained.

Ainsworth takes issue with the ALJ's evaluation of several medical opinions of record. First he argues that the ALJ erred by failing to adequately explain the limited weight he accorded to treating orthopedic surgeon, Dr. Dahl's April 20,

2010 Pennsylvania Department of Welfare Employability Assessment Form ("Assessment Form"),[5] (Tr. 174), wherein Dr. Dahl checked the box indicating that Ainsworth was temporarily disabled.   Second, he argues that the ALJ erred in failing to discuss medical records submitted by his treating pain management specialist, Dr. Lupinacci.   Third, he argues that the ALJ erred in in failing to explain the "significant weight" he accorded to two medical source statements authored by his primary care physician, Dr. Daugherty.   Fourth, he argues that the ALJ erred in failing to explain the weight he ascribed to consultative evaluations performed by psychologists Dr. Schneider and Mr. Thomas, and the mental RFC assessment and PRT form completed by state agency psychologist, Dr. Suminski.

The Regulations divide opinion evidence into two categories: (1) medical opinions by "acceptable medical sources;"[6] and, (2) medical or non-medical opinions by "other sources."  20 C.F.R. §§ 404.1502, 404.1513, 416.902, 416.913. This distinction is of particular importance because only an acceptable medical source may establish the existence of an impairment. *See* 20 C.F.R. §§ 404.1513, 416.913; Social Security Ruling ("SSR") 06-3p. Opinions by "other sources,"

---

[5] According to the record, Assessment Form is used to assess qualifications for General Assistance benefits.  *Tr.* 172-74.

[6] Acceptable medical sources are: licensed physicians (medical or osteopathic doctors); licensed or certified psychologists; licensed optometrists; licensed podiatrists; qualified speech– language pathologists.  20 C.F.R. §§ 404.1513, 416.913.

however, are germane to the issues of how a claimant's impairments might affect his or her ability to work.  SSR 06-3p.

All "acceptable medical sources" are either treating sources, nonexamining sources, or nontreating sources based on the nature of their relationship with the claimant.  A treating source is an acceptable medical source who provided the claimant with treatment or evaluation during the course of an ongoing treatment relationship.   20 C.F.R. §§ 404.1502, 416.902.   A nontreating source is an acceptable medical source who has examined the claimant, but did not have an ongoing treatment relationship. *Id.*   A nonexamining source is an acceptable medical source who provided a medical opinion without examining the claimant. *Id.*   In general, more weight will be accorded to a source who has actually examined the claimant.  20 C.F.R. §§ 404.1527, 416.927.

When evaluating opinions by a treating source, it is well-established that the ALJ accord treating physicians' reports great weight, especially when such opinions reflect expert judgment based on a continuing observation over an extended period of time.  *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Plummer*, 186 F.3d at 429; *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987). This preference for opinions by treating sources is manifest in the Regulations, which provide that:

> [i]f [the ALJ] find[s] that a treating source's opinion on the issue(s) of
> the nature and severity of [a claimant's] impairment(s) is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p.

Finding that the medical opinion of a treating source is not entitled to controlling weight does not mean the opinion should be rejected. SSR 96-2p. In many cases, a treating source's non-controlling medical opinion will be entitled to great deference. *Id.* Where no medical opinion is entitled to controlling weight under the Regulations, the probative weight of all non-controlling opinions by treating sources, nontreating sources, and nonexamining sources is evaluated based on several factors. Pursuant to 20 C.F.R. §§ 404.1527(c) and 416.927(c), non-controlling medical opinions must be weight based on: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. In addition, the ALJ must consider any other factors that tend to support or contradict the opinion, but only if brought to his or her attention. 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6).

The opinions of state agency medical and psychological consultants can be given weight insofar as they are supported by evidence in the case record. SSR 96-6p. "In appropriate circumstances, opinions from State agency medical and

psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." *Id.* In *Morales*, the Court of Appeals for the Third Circuit set forth the standard for weighing opinions by treating, nontreating, and nonexaminaing physicians, stating that:

> Where...the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer,* 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. *See Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Morales,* 225 F.3d at 317-318.

Here, according to the ALJ, Dr. Dahl's finding of temporary disability on the Assessment Form was not supported by the objective and clinical findings and was inconsistent with Ainsworth's treatment and his activities of daily living. *Tr.* 20. Prior to this conclusion, the ALJ provided specific references to Ainsworth's medical treatment of his knee pain, including specific references to his treatment with Drs. Dahl and Werner after the date of the Assessment Form and up until July 25, 2011. *Tr.* 19. The ALJ noted that Dr. Dahl observed, on May 25, 2011, that

Ainsworth's "right lower extremity was neurovascularly intact with good sensation and good distal pulses" and that he advised Ainsworth to "start biking." *Id.* The ALJ further noted that medical records subsequent to July 15, 2011, reflected some right knee tenderness but full range of motion in both knees and successful management of pain. *Id.* Moreover, citing record evidence of Ainsworth's day-to-day activities (*Tr.* 20) the ALJ found that Ainsworth prepared meals, ran the vacuum, showered and dressed himself, and took care of his personal needs independently. He further found that Ainsworth paid his bills, played video games, and watched television, and although he did not drive due to a past DUI, he went grocery shopping, attended scheduled appointments, and rode his bike around the block. *Tr.* 20.

Viewing the ALJ's conclusion to ascribe "little weight" to Dr. Dahl's April 20, 2010 assessment of temporary disability against the backdrop of this recitation of findings and the whole of the opinion, I find that the ALJ sufficiently supported his determination. Additionally, a medical source's opinion as to the ultimate conclusion of disability is not dispositive because opinions of disability are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Further, a check-box form, such as the Assessment Form, which merely requires a physician to check a box or fill in a blank is considered, at best, weak evidence. *Mason*, 994 F.2d at 1065. Finally, contrary to Ainsworth's argument, I do not find

that the ALJ's opinion regarding why Dr. Dahl may have assessed Ainsworth as being temporarily disabled at that time, casted aspersions on Dr. Dahl's professional integrity or ethics.

I further find that, with respect to Ainsworth's third argument, the ALJ's analysis of Dr. Daughrty's July 27, 2010 and October 20, 2011 medical source statements is well-reasoned and his decision to ascribe them significant weight in establishing the RFC is supported by substantial evidence. The ALJ acknowledged that the statements were prepared at different points in time and each consistent with the record evidence at the time. The ALJ noted that he viewed Dr. Daughtry's findings of Ainsworth capacities in the July 2010 source statement in a light more favorable to Ainsworth in establishing the RFC. Moreover, the ALJ accorded Dr. Daughtry's October 21, 2011 medical source statement great weight in establishing Ainsworth's RFC, finding it consistent with the record as a whole. This finding appropriately credited the long-term treating relationship between Ainsworth and Dr. Daughtry. Further, the record as a whole establishes that the decision to give great weight to Dr. Daughtry's October 21st medical source statement was made in a light favorable to Ainsworth since the ALJ found that other physicians' assessments a few months earlier showed full range of motion in both knees, that Ainsworth was advised to start biking, and that his treatment had been relatively successful in managing his knee pain. *Tr.* 19. Moreover, I do not

find Dr. Daughtry's source statements internally inconsistent, as Ainsworth argues, but rather consistent with the medically acceptable clinical evidence developed as of each date and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Contrary to Ainsworth's characterizations of Dr. Daughtry's medical source statement findings, Dr. Daughtry opined that Ainsworth was lying on the couch when he was not sitting, standing, or walking. Dr. Daughtry did not answer that Ainsworth was *required* to lie on the couch. *Tr.* 363. Accordingly, I find that the ALJ's explanation, regarding Dr. Daughtrty's medical source statements, is supported by substantial evidence.

With respect to Ainsworth's fourth argument, that the ALJ erred in failing to explain the weight he ascribed to the evaluations performed by consulting psychologists, Dr. Schneider and Mr. Thomas, and the mental RFC assessment and PRT form, completed by state agency psychologist, Dr. Suminski, I find that the ALJ did not err in explaining the weight given to these examinations. Contrary to Ainsworth's assertions, the ALJ plainly related that he gave Dr. Schneider's "assessment significant weight as it is consistent with clinical findings as well as the claimant's treatment and activities of daily living." *Tr.* 21. Additionally, the record establishes that Ainsworth told Dr. Schneider that he could work in a sitting position, was motivated to learn other kind of work, and can ride a bicycle. *Tr.*

287.  I find that the ALJ's assessment of Mr. Thomas' psychological evaluation of Ainsworth was also well-reasoned and supported by substantial evidence.  In essence, Mr. Thomas opined that Ainsworth had low average intellectual functioning, that it was doubtful that Ainsworth was capable of gainful and competitive employment, and that given his learning disabilities, it was doubtful he could be trained or educated.  *Tr.* 360.  In rejecting this opinion, the ALJ relied on record evidence that Ainsworth completed 12 years of formal education, attained grades ranging from Cs to As, and had engaged in semi-skilled work in the past.  *Tr.* 21.  Last, I find that the ALJ did not err in explaining the weight he ascribed to Dr. Suminski's PRT form of October 7, 2010.  The ALJ found such assessment conclusions to be an "over exaggeration of the severity of [Ainsworth's] mental impairments," which he is permitted to do.   Pursuant to the applicable Regulations, the ALJ is permitted to give more weight to a consultative examiner, such as Dr. Schneider, than to a non-examining source such as Dr. Suminski, the state agency physician.  20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

Finally, Ainsworth's bald assertion that the ALJ erred in failing to make any finding on weight ascribed to "the opinion of Dr. Lupinacci," is unsupported by any further argument or references to the record.  PRISM physicians and a physician's assistant saw Ainsworth during the time period of December 1, 2010 to September 22, 2011.  The documentation from PRISM in this record consists of a

letter to Dr. Dahl  (*Tr.* 381-82), a letter to Dr. Daughtry (*Tr.* 320), and treatment

notes regarding impressions, summaries of physical exams, and pain and

medication management.  *Tr.*  324, 326, 330, 371-75, 379, 418-19.  Such reports

are not considered "medical opinions" under the Regulations; thus, the ALJ did not

err in not considering them.  A medical opinion is defined as a "statement[ ] from

physicians and psychologists or other acceptable medical sources that reflect

judgments about the nature and severity of [a claimant's] impairment(s), including

[the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still

do despite impairment(s), and [the claimant's] physical or mental restrictions."  20

C.F.R. § 404.1527(a)(2).  In contrast, treatment notes that "reflect the clinicians'

observations of [the claimant's] symptoms, the nature of [the claimant's]

impairments, and the clinicians' diagnoses," but "do not indicate any prognoses,

nor …provide opinions as to what [the claimant] could still do despite [his]

impairments . . ." do not qualify as medical opinions.  *McDonald v. Astrue*, 492 F.

Appx. 875, 884 (10th Cir. 2012); *see also Flint v. Colvin*, 2014 WL 2818665, * 19

(D. Minn. June 23, 2014);  *Moxley v. Colvin*, 2014 WL 2167878, * 5 (M.D.N.C.

May 23, 2014).

Accordingly, I find that substantial evidence supports the weight ascribed by

the ALJ to the examining and treating physicians' assessments.  I further find that

after review of this record, the ALJ adequately explained the weight he ascribed to the opinions and assessments of the physicians of which Ainsworth takes issue.[7]

## B.  The ALJ properly assessed Ainsworth's and Ms. Bucher's credibility.

In general, the ALJ is in the best position to evaluate a claimant's and his or her witness's credibility and such determinations are entitled to much deference and will not be disturbed if there is substantial evidence supporting those findings. *See Rohrbaugh v. Astrue*, 588 F. Supp. 2d. 583, 592 (D.Del. 2008) (citing *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1998)); *see also Wilson v. Apfel*, 1999 WL 993723, *3 (E.D. Pa. Oct. 29, 1999). The ALJ, however, must explain the reasons for his or her credibility determinations. *Schonewolf v. Callahan*, 972 F.Supp. 277, 286 (D.N.J.1997) (citations omitted). "Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garrett v. Comm'r of Soc. Sec.*, 274 Fed.Appx. 159, 164 (3d Cir.2008) (citing *Burns v. Barnhart,* 312 F.3d 113, 129–30 (3d Cir.2002)).   Allegations of pain and other subjective

---

[7]   Although unclear and entirely undeveloped, Ainsworth's intimation that he meets a Listing is without merit.   The record here fails to establish that his impairments match or are equivalent to a listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990).

symptoms also must be supported by objective medical evidence. *Hartranft*, 181 F.3d at 362.

That being said, where a disability determination turns on an assessment of the level of a claimant's pain, the Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. §§ 404.1529, 416.929. Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." *Hartranft,* 181 F.3d at 362. Cases involving an assessment of subjective reports of pain "obviously require[ ] the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Id.*

In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's pain. Instead, at the outset, by statute the ALJ is admonished that an:

> individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence ..., would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); *see also* 42 U.S.C. § 1382c(a)(3)(H)(i)(incorporating 42 U.S.C. § 423(d)(5)(A) by reference).

Applying this statutory guidance, the Social Security Rulings and Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p; SSR 96-7p. First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 96-7p. Once the existence of a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms has been established, the adjudicator must recognize that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 96-7p. Thus, during the second step of his or her credibility assessment, the adjudicator must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the adjudicator's evaluation of the entire case record. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and "other medical

sources;" and, information concerning the claimant's symptoms and how they affect his or her ability to work. *Id.*

Other sources may provide information from which inferences and conclusions may be drawn about the credibility of a claimant's statements. SSR 96-7p. Examples of such sources include: public and private agencies, opinions by medical sources, and non-medical sources, such as a claimant's family and friends. *Id.* Such sources may provide information about the seven regulatory factors outlined in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3),[8] or may be helpful in establishing a longitudinal record. *Id.* The adjudicator is not bound by such statements, however, if the case record includes statements by a medical or non-medical source on the credibility of a claimant's statements about limitations or restrictions, the adjudicator should assess the probative weight of these statements under the framework articulated in 20 C.F.R. §§ 404.1527 and 416.927. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

---

[8] The ALJ will consider factors relevant to a claimant's symptoms such as: the claimant's daily activities; location duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatments, other than medication, the claimant received to relieve his or her symptoms; any measures the claimant uses or has used to relieve his or her symptoms; and, any other factors concerning his or her functional limitations and restrictions due to his or her symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

Although the Regulations governing the evaluation of opinion evidence do not expressly apply to medical or non-medical opinions by "other sources," like Ms. Bucher, SSR 06-03p provides that the factors outlined in 20 C.F.R. §§ 404.1527 and 416.927 are the basic principles that may be applied to the consideration of medical opinion evidence by "other" sources. In considering opinions by other sources, however, not every factor for weighing opinion evidence will apply in every case. SSR 06-03p. For example, in considering evidence from non-medical sources such as a spouse, friend, or neighbor, it would be appropriate for the adjudicator to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that support or refute the evidence. *Id.*

Ainsworth argues that the ALJ improperly applied the facts to the instructions embodied in SSR 96-7p for evaluating the credibility of his and Ms. Bucher's statements regarding his subjective symptoms. He asserts that the ALJ failed to point to any evidence sufficient to overcome their statements of his limitations, which he contends are amply supported by the evidence. I disagree.

Here, I am persuaded that the ALJ properly analyzed Ainsworth's subjective complaints of disability and pain. The ALJ recognized Ainsworth's complaints of pain, grinding in his knees, numbness and tingling in his left leg, occasional pain in his low back, and his inability to walk very long distances. *Tr.* 19-20. Similarly,

the ALJ noted that Ainsworth reported that he sits on the couch most of the day with his right leg propped up, that he is forgetful and needs reminders to take his medication. *Id.* Considering the record as a whole, as he is required to do, the ALJ found Ainsworth's and Ms. Butcher's credibility lacking. *Tr.* 20. The ALJ determined that, notwithstanding the statements of pain and limitations, Ainsworth is able to prepare meals, run the vacuum, shower, dress himself, and take care of his personal hygiene independently. *Id.* Further, the ALJ found that Ainsworth is able to pay bills, play video games, watch TV, grocery shop, attend scheduled appointments, and ride his bike around the block. *Id.* Importantly, the ALJ did not base his determination solely on Ainsworth's daily activities, but considered them, as per the Regulations, in the context of the record as a whole, including the objective medical evidence that Ainsworth had been conservatively treated by Drs. Dahl, Werner,

and Daughtrey and that his pain had been sufficiently managed, by his own admission, by Dr. Lupinacci. Thus, the ALJ properly found that both Ainsworth's and Ms. Butcher's claims of Ainsworth's constant pain were unsupported by objective and clinical findings, and the "allegations concerning [Ainsworth's] symptoms and limitations [were] also inconsistent with other statements made concerning his functional abilities and activities of daily living." *Tr.* 18-19.

Accordingly, I find that the ALJ's credibility assessments of Ainsworth and Ms. Bucher are supported by substantial evidence in the record.

### C.  Formulation of Hypothetical Questions Posed to a Vocational Expert.

Since one of the principal contested issues in this setting relates to the claimant's residual capacity for work in the national economy, an ALJ must exercise care when formulating proper hypothetical questions to VE's who opine on the availability of work for a particular claimant. In this regard, the controlling legal standards are clear, and clearly defined. As the United States Court of Appeals for the Third Circuit has observed:

> Discussing hypothetical questions posed to [VE's], we have said that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the [VE's] testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny*, 745 F.2d at 218. A hypothetical question posed to a [VE] "must reflect *all* of a claimant's impairments." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987) (emphasis added).  Where there exists in the record medically undisputed evidence of specific impairments not  included in a hypothetical question  to a [VE], the expert's response is not considered substantial evidence. *Podedworny*, 745 F.2d at 218 (citing *Wallace v. Secretary of Health & Human Servs.*, 722 F.2d 1150, 1155 (3d Cir. 1983)).

*Burns*, 312 F.3d at 123.

The formulation of a proper hypothetical question has a dual significance in social security proceedings. First, as an evidentiary matter, it determines whether

the VE's opinion can be considered as substantial evidence supporting an ALJ finding. *See e.g. Burns*, 312 F.3d at 123.   More fundamentally, however, an erroneous or inadequate hypothetical question undermines the reliability of any RFC determination since "objections to the adequacy of hypothetical questions posed to a [VE] often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554 n. 8 (3d Cir. 2005).   While at the fifth step, the ALJ's hypotheticals must include all of a claimant's impairments supported by the evidence, the ALJ is not required to "submit to the [VE] every impairment *alleged* by a claimant."   *Rutherford*, 399 F.3d at 554 (emphasis in original).

Ainsworth argues that the ALJ erred in the fifth and final step of the sequential evaluation process by failing to include Ainsworth's limitations in attention, concentration, and focus in the hypothetical questions posed to the VE, an error which would preclude the ALJ from relying on the VE's testimony to support his decision.  Ainsworth points to Dr. Schneider's opinion that in the areas of understanding, remembering, and carrying out instructions he was moderately impacted, that he was sometimes forgetful, and was better with written instructions.  *Tr.* 293.  He further relies on reviewing psychologist, Dr. Suminski's, PRT form on which he assessed moderate difficulties in the areas of maintaining attention and concentration for extended periods.  *Tr.* 300.  Finally, Ainsworth

asserts that Mr. Thomas found that his "immediate and short term memory impairment as well as latencies in thought organization/expression and motoric response" were regressed. *Tr.* 359.

Contrary to Ainsworth's assertions, I find that the ALJ's hypothetical questions adequately accounted for all of Ainsworth's functional limitations which were supported by substantial evidence in the record. As discussed, the ALJ gave limited weight to the consultative examiner's RFC evaluation because he concluded that it was an exaggeration of the severity of Ainsworth's mental impairments. *Tr.* 21. Similarly, the ALJ gave little weight to Mr. Thomas's assessment, finding it inconsistent with Ainsworth's school records, which showed grades ranging from Cs to As, or his past work, which included semi-skilled work activity. *Id.* Finding such assessments to be unsupported by the record as a whole, the ALJ was not required to include the limitations in his hypotheticals.

Moreover, the hypotheticals posed by the ALJ to the VE referenced the individual only performing light work. *Tr.* 67-70. SSR 85-15 explains that basic demands of unskilled work include the abilities "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15p; *see also* SSR 96-9p; 20 C.F.R. §§ 404.1568(a), 416.968(a). Dr. Schneider, whose opinion the ALJ properly ascribed significant weight, opined

that Ainsworth's concentration was acceptable and his pace average. *Tr.* 291. He further found that his abilities to understand, remember and carry out instructions were only moderately impacted by his impairment. *Tr.* 293. Notably, Dr. Schneider found Ainsworth only slightly impacted in his ability to make judgments on simple work-related decisions. *Tr.* 293.

Thus, in asking the VE only about light, unskilled jobs, the ALJ properly incorporated the limitations the ALJ deemed credible based on Dr. Schneider's opinion, and that were consistent with the record as a whole. I find, therefore, that the ALJ's conclusion that Ainsworth was capable of performing work that exists in the national economy from May 1, 2009, to February 23, 2012, is supported by substantial evidence.

## V.   RECOMMENDATION.

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be AFFIRMED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The

briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 11th day of August 2014.


*S/Susan E.  Schwab*
Susan E. Schwab
United States Magistrate Judge